UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Thomas R. Butler,

    Plaintiff,

v.

Papendick *et al*.,

    Defendants.

Case No. 20-11100
District Judge Denise Page Hood
Magistrate Judge Jonathan J.C. Grey

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Thomas Butler brings this complaint under 42 U.S.C. § 1983 against Dr. Keith Papendick and Nurse Deena M. Leighton for violations of his Eighth Amendment rights. (ECF No. 1.) This matter is before the Court on Papendick's motion for summary judgment on the basis of exhaustion. (ECF No. 22.)

For the following reasons, the undersigned **RECOMMENDS** that Papendick's motion for summary judgment (ECF No. 22) be **GRANTED**.

1

I.      **Background**

      **A. Procedural History**

On April 1, 2020, Butler filed his complaint against all defendants. (ECF No. 1.) Judge Denise Page Hood dismissed MDOC from this case. (ECF No. 5.) Papendick and Leighton remain as defendants.

On November 2, 2021, Papendick moved for summary judgment on the basis of exhaustion. (ECF No. 22.) Butler responded (ECF No. 24), and Papendick replied (ECF No. 25.)

      **B.  Relevant Facts**

Butler is an incarcerated person with a history of chronic ear pain. (ECF No. 1.) Butler contends that Papendick displayed deliberate indifference to his serious medical needs. (*Id.* at PageID.22.)

According to his complaint, Butler reported to MDOC Health Care regarding chronic left ear pain and dizziness on or about January 2, 2014. (*Id.* PageID.3.) MDOC issued ibuprofen and ear drops and ordered antibiotics to resolve the issue. (*Id.*) The following week, Butler told MDOC that his pain had subsided, and he expressed concern about using the antibiotics that MDOC ordered. (*Id.*) At that visit, MDOC noted that Butler's tympanic membrane was "visual but scarred." (*Id.*)

Butler's pain returned and his symptoms worsened. (*Id.*) Throughout 2014 and into 2015, MDOC healthcare personnel continued to treat Butler for chronic ear infections. (*Id.* at PageID.3–10.) Butler experienced pain, bleeding, drainage, and conductive hearing loss. (*Id.* at PageID.3–5.) On or about April 13, 2015, MDOC noted that Butler might have a cholesteatoma.[1] (*Id.* at PageID.5.)

On or about April 28, 2015, Butler visited an ear-nose-throat specialist at Superior Ear Nose Throat, who recommended a computed tomography ("CT") scan to evaluate for cholesteatoma. (*Id.*) On or about June 11, 2015, MDOC requested an ENT exam, noting Butler's chronic ear infections. (*Id.*) That same day, Papendick denied the request for want of medical necessity. (*Id.* at PageID.6.)

On or about July 28, 2015, Butler returned to Superior Ear Nose Throat. (*Id.* at PageID.6–7.) The specialist noted that Butler had still not undergone a CT scan. (*Id.*) On or about August 4, 2015, MDOC sent Butler to undergo a CT scan. (*Id.* at PageID.7.) The results of the scan led an MDOC ENT to conclude that Butler most likely had a cholesteatoma and needed surgery to repair it. (*Id.* at PageID.8.)

After discussions with MDOC and a surgical consultation with the Michigan Ear Institute ("MEI"), Butler had surgery on or about February 4, 2016. (*Id.* at PageID.8–11.) On or about February 10, 2016, Butler had his follow-up

---

[1] Cholesteatoma is "a cystlike mass or benign tumor lined with stratified squamous epithelium, usually keratinizing, and filled with desquamating debris often including cholesterol." *Cholesteatoma*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

3

appointment with MEI. (*Id.* at PageID.12.) MEI advised that Butler return within four to six months for another follow-up appointment with an audiogram, but MDOC denied this request on or about June 7, 2016. (*Id.* at PageID.13.) Papendick approved the denial on or about June 9, 2016. (*Id.*)

In January of 2017, Butler attended an appointment with MDOC for a bilateral ear irrigation. (*Id.*) However, MDOC could not flush Butler's ears because Butler experienced severe vertigo during flushing. (*Id.*) In February of 2017, Butler reported that he could not hear out of his left ear. (*Id.* at PageID.14.)

On or about March 3, 2017, MDOC conducted the audiogram that MEI had requested. (*Id.*) On or about May 2, 2017, Butler visited the Audiology Clinic at Duane L. Waters Health Center, where they recommended that Butler follow up with an ENT Specialist. (*Id.* at PageID.15–16.) MDOC Health Care personnel requested authorization for a follow-up appointment in the following week, but other MDOC personnel denied the request. (*Id.* at PageID.16.) Papendick "reviewed this process." (*Id.*) MDOC claims that Butler was indifferent about an ENT follow-up, which is why MDOC denied the request. (*Id.*) Butler contests that account. (*Id.*)

The rest of Butler's complaint details his chronic ear ailments from January 2018 through December 2019. (*Id.* at PageID.17–22.) Butler does not mention

other instances of Papendick denying requests or reviewing denials of requests for treatment.

While not mentioned in the complaint, Butler has resided in at least five prisons. (ECF No. 24, PageID.238.) Butler is currently incarcerated at the G. Robert Cotton Correctional Facility ("JCF"). (ECF No. 1, PageID.2.) Butler has previously resided at Bellamy Creek Correctional Facility ("IBC"), Alger Maximum Correctional Facility ("LMF"), Macomb Correctional Facility ("MRF"), and Thumb Correctional Facility ("TCF"). (ECF No. 24, PageID.239–240.) The record provides no information on the order in which Butler stayed at each facility, but Butler resided at TCF from June 13, 2013 to December 9, 2014. (ECF No. 22-1, PageID.192.)

**C. MDOC Grievance Process**

MDOC provides a three-step grievance process that prisoners must follow to exhaust administrative remedies. MDOC Policy Directive 03.02.130 (effective July 9, 2007); MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019).[2] Per MDOC policy, grievants must include the "[d]ates, times, places, and names of all those involved in the issue being grieved." MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ R; MDOC Policy Directive 03.02.130 (effective Mar. 18,

---

[2] All of Butler's Step I and II grievances were filed under MDOC Policy Directive 03.02.130 (effective July 9, 2007). All of Butler's Step III grievances were filed under MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019). The Court accordingly cites to both Policy Directives.

5

2019) ¶ S. Prior to Step I, a grievant must "attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue." MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ P; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ Q. If there is no resolution, the grievant may file a Step I grievance within five business days. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ P; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ Q. At Step II, a grievant may appeal the denial of a Step I grievance within ten business days after receipt of the Step I response. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ BB; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ DD. At Step III, a grievant may appeal the Step II denial within ten business days after receipt of the Step II response. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ FF; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ HH. Grievances at all steps are logged in a computerized tracking system. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶¶ W, CC, GG; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ X, EE, II.

## II. Standard of Review

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), courts must grant motions for summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Moreover, a fact is material "only if its resolution will affect the outcome of the lawsuit." *Id*. at 451–52 (citing *Anderson*, 477 U.S. at 248).

In reviewing a summary judgment motion, the Court must draw all justifiable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The burden of demonstrating the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears this responsibility by identifying portions of the record that show the absence of a genuine issue as to any material fact. *Id*. If the moving party meets its burden, the burden then shifts to the nonmoving party to establish "specific facts showing that there is a genuine issue for trial." *Id*. at 324. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," the moving party is then entitled to summary judgment. *Id*. at 322.

### B. Exhaustion

The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust all available administrative remedies before filing an action about prison conditions. 42 U.S.C. § 1997e(a). The Supreme Court requires that a grievant exhaust all administrative remedies before filing a lawsuit. *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). It is also "the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 218. Proper exhaustion entails "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original) (citation and internal quotations omitted).

Failure to exhaust is an affirmative defense, so prisoners are "not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. The burden thus rests on defendants to establish failure to exhaust. *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011). Once the defense of failure to exhaust is raised, the grievant must "present 'significant probative evidence' to defeat the motion for summary judgment." *Id*.

Here, Butler was required to undertake all steps of the MDOC process to fully exhaust his grievances. *Woodford*, 548 U.S. at 90. Papendick, who bears the

8

burden of proof, provided Butler's Step III grievance report. (ECF No. 22-1, PageID.181–82.)

According to the report, prior to filing his lawsuit, Butler pursued five grievances through Step III: 1) TCF-18-12-0523-12D ("Grievance 0523"); 2) MRF-18-12-1914-28B ("Grievance 1914"); 3) LMF-18-12-4625-28E ("Grievance 4625"); and 4) IBC-18-12-2930-28B ("Grievance 2930"); and 5) JCF-19-11-2107-28i ("Grievance 2107"). Only Grievance 0523 is relevant here.

Butler submitted Grievance 1914, Grievance 4625, Grievance 2930, and Grievance 0523 at different MDOC facilities in December of 2018. (ECF No. 22-1, PageID.181–82.) All four grievances are nearly identical, save for nominal references to the prison (e.g., using "IBC" for the grievance submitted to IBC, using "MRF" for the grievance submitted to MRF, etc.). (*Id.* at PageID.191, 195, 200, 206.) They are all directed against "MDOC and medical staff, Corizon," and each facility's corresponding health care staff. (*Id.*) In all four grievances, Butler grieves the prison's failure to provide follow-up care despite instructions from specialists. (*Id.*) MDOC rejected Grievance 1914, Grievance 4625, and Grievance 2930 as either untimely or vague and did not process them on the merits. (*Id.* at PageID.196, 202, 208.)

Grievance 2107 does not grieve any issues relevant to Butler's complaint. (*Id.* at PageID.186.)

9

The Court will focus on Grievance 0523.

## III. Analysis

Butler failed to exhaust his administrative remedies against Papendick because he did not name Papendick at Step I for Grievance 0523.

On December 6, 2018, Butler submitted a Step I grievance for Grievance 0523. (ECF No. 22-1, PageID.191.) In this grievance, Butler alleged that he had not received proper medical care and lost left ear functions as a result. (*Id.*) Butler grieved 2015, 2016, and 2017 denials of specialist-ordered follow-up care. (*Id.*) Butler named "TCF Health Care Staff, all Doctors and Nurses," "MDOC & medical staff," and "Corizon." (*Id.*) Butler wrote that specific titles and names "are unavailable." (*Id.*) Butler did not list Papendick by name. (*Id.*)

At Step I, TCF denied Butler's grievance, which grieved issues from a non-TCF facility. (*Id.* at PageID.192.) TCF detailed Butler's time at the facility in its Step I response by describing Butler's constant care from June 13, 2013 to December 8, 2014. (*Id.*) TCF concluded that it saw Butler for scheduled appointments, and that it rendered care. (*Id.*) TCF also indicated that Butler never saw a specialist while at TCF, and that there was no delay in care. (*Id.*)

In his Step II grievance, Butler wrote "All issues and parties from Step I carry over to Step II." (*Id.* at PageID.189.) Again, Butler did not name Papendick. (*Id.*)

10

In their Step II denial, TCF wrote that it housed Butler from June 13, 2013 to December 9, 2014, and that TCF medical personnel frequently evaluated Butler for frequent ear infections.[3] (*Id.* at PageID.190.) TCF restated that Butler never saw a specialist while at TCF. (*Id.*)

In his Step III grievance, Butler wrote "All issues and parties from Step I and Step II carry over to Step III." (*Id.* at PageID.189). Butler did not provide any new information, like Papendick's name. (*Id.*) In their Step III denial, TCF wrote that their Step I and Step II denials adequately addressed the grievance. TCF denied Butler's grievance and reaffirmed their Step I and Step II responses. (*Id.* at PageID.188.)

## A. There is a Genuine Dispute of Material Fact about the Timeliness of Grievance 0523

Papendick argues that Butler did not exhaust against Papendick because Butler did not file any grievance against Papendick during the times that Butler alleges denials of follow-up care. (ECF No. 22, PageID.176.)

Butler initiated his grievance on December 6, 2018. (ECF No. 22-1, PageID.191.) However, Papendick allegedly denied or reviewed denials of follow-up care on or around June 11, 2015, June 9, 2016, and May 9, 2017. (ECF No. 1, PageID.6–16.) MDOC policy required that Butler attempt to resolve those denials

---

[3] It is unclear whether Butler was transferred from TCF on December 8, 2014 or December 9, 2014. TCF cites December 8, 2014 at Step I and December 9, 2014 at Step II.

11

with Papendick within two business days after becoming aware of them. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ P; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ Q.

But when did Butler become aware of Papendick's alleged denials? Did Butler know that MDOC healthcare personnel requested follow-up or specialist care? If so, did he learn that such requests were denied before he received his medical records? The record does not provide clear answers to these questions.

Butler does not allege that he sought resolution within two business days of the 2015, 2016, or 2017 appointment denials. (ECF Nos. 1, 24.) However, Butler implies that he did not become aware of the grievable issue until he received his medical records on December 2, 2018. (ECF No. 22-1, PageID.191.) In his grievance, Butler claims that after receiving his medical records, he sent an informal written complaint to "TCF Health Care" on December 3, 2018 before submitting his Step I grievance on December 6, 2018. (*Id.*) If Butler first became aware of the denials on December 2, 2018, he complied with the MDOC's timing requirements. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ P; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ Q.

Therefore, in drawing all justifiable inferences in the light most favorable to Butler as the nonmoving party, there is a genuine dispute of material fact as to whether Butler knew that Papendick denied requests for follow-up care prior to

12

receiving his medical records. *Matsushita*, 475 U.S. at 587–88. The Court is not certain that Butler was privy to the requests for and denials of follow-up appointments before December 2, 2018.

### B. Butler did not Name Papendick During the Grievance Process

Assuming the grievance was timely, Butler had his medical records when he filed his grievance. (ECF No. 24, PageID.238.) Yet, Butler still failed to name Papendick. (ECF No. 22-1, PageID.191, 195, 200, 206.) Papendick argues that this procedural defect proves that Butler did not exhaust his administrative remedies against Papendick. (ECF No. 22, PageID.177.)

Butler did not name Papendick at any step in the grievance process. (ECF No. 22-1. at PageID.189, 191.) Butler only listed "TCF Health Care Staff, all Doctors and Nurses," "MDOC & medical staff," and "Corizon." (*Id*.)

The MDOC grievance process requires a grievant to include the names of all those involved in the issue they are grieving. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ R; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ S. Failure to do so at Step I generally constitutes a failure to properly exhaust administrative remedies. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *see also Burley v. Michigan Dep't of Corr.*, No. 16-CV-10712, 2016 WL 11259277, at *7 (E.D. Mich. Nov. 30, 2016), report and recommendation adopted, No. 16-CV-10712, 2017 WL 877219 (E.D. Mich. Mar. 6, 2017) ("By

13

naming [the defendant] at only step II of the grievance process, and failing to name [the defendant] at step I, [the plaintiff] has failed to properly exhaust this claim against [the defendant.]").

The Sixth Circuit recognizes an exception to this general rule. If MDOC grievance screeners overlook or forgive a procedural defect and address a grievance on the merits, they "cannot be heard to complain about that defect in later litigation." *Johannes v. Washington*, No. 14-11691, 2016 WL 1253266 at *10 (E.D. Mich. Mar. 31, 2016) (citation omitted); *see also Reed-Bey*, 603 F.3d at 323 ("Because the Michigan Department of Corrections opted to dismiss his grievance on the merits rather than invoke its procedural bar, Reed-Bey exhausted his claim.").

Butler argues that the exception should apply in this case because TCF processed the grievance on the merits instead of rejecting it on procedural grounds. (ECF No. 24, PageID.245.) However, the Court declines to extend the *Reed-Bey* exception. In Grievance 0523, Butler raised issues that arose in 2015, 2016, and 2017 with TCF, a prison that housed him from 2013 to 2014. Grievance 0523 cannot provide notice to Papendick because Papendick's alleged appointment denials did not happen until *after* Butler left TCF. *See Bonga v. Abdellatif*, No. 16-cv-13685, 2017 WL 9802709 at *5 (E.D. Mich. Dec. 11, 2017), report and recommendation adopted, No.16-13685, 2018 WL 1312403 (E.D. Mich. Mar. 14,

14

2018) (holding that "[Plaintiff's] grievance relating to care received at a particular period of time in one particular MDOC facility does not exhaust his remedies as to all MDOC provided medical care for all times and in all places" where a plaintiff submitted a grievance to his current prison for issues that arose at a previous prison.)

Because this Court declines to extend the *Reed-Bey* exception, Papendick did not waive defenses based on Grievance 0523's procedural defects. Thus, Butler did not exhaust his administrative remedies against Papendick.

### C. The Grievance Process was Available to Butler

Nevertheless, Butler argues that he could not exhaust his administrative remedies because remedies were unavailable to him. (ECF No. 24, PageID.236.) Upon request, Butler received approximately 300 pages of medical records from MDOC. (ECF No. 24, PageID.238.) According to Butler, the records contained hundreds of names "which were unidentifiable, as to who certain individuals were [and] where they were employed." (*Id.*) Butler sought assistance to write his grievance from JCF's Warden and Grievance Coordinator, but he did not receive a response. (*Id.*) Butler contends that the long list of unknown people and the lack of help made the grievance process "unavailable" to him. (ECF No. 24, PageID.246.) This Court disagrees.

Under the PLRA, prisoners need only exhaust those administrative remedies that are "available" to them. *Ross v. Blake*, 578 U.S. 632, 638 (2016). There are three circumstances in which an administrative remedy is unavailable: 1) the remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" 2) the "administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;" and 3) "prison administrators thwart inmates from taking advantage of a grievance process though machination, misrepresentation, or intimidation." *Id.* at 643–45.

Butler contends that the administrative process was so opaque that it was incapable of use. (ECF No. 24, PageID.246.) The opacity circumstance "is a high bar that requires the policy to be essentially unknowable such that no prisoner can make sense of what it demands." *Wagle v. Corizon*, No. 19-13787, 2022 WL 988371 at *2 (E.D. Mich. Mar. 31, 2022) (citations omitted).

First, Butler indicates that the grievance process is arbitrary and opaque because he received different responses to the same grievance. (ECF No. 24, PageID.240.) Grievance 1914, Grievance 4625, Grievance 2930, and Grievance 0523 are nearly identical, yet each prison handled each grievance differently. (ECF 22-1, PageID.191, 195, 200, 206.)

16

As puzzling as that may be, it does not prove that the grievance process was unavailable to Butler. Despite different responses, the grievance process was not "so confusing that no reasonable prisoner [could] use it." *Wagle*, 2022 WL 988371 at *2 (citations omitted) (internal quotations omitted). Indeed, Butler appealed Grievance 0523 to Step III. (ECF No. 22-1, PageID.181.)

Second, Butler emphasizes the unnavigable nature of the hundreds of names in his medical records. (ECF No. 24, PageID.246.) Butler's inability to identify names in medical records does not mean that the grievance policy was "essentially unknowable." *Wagle*, 2022 WL 988371 at *2 (citations omitted). Butler may not have known how to structure his grievance, but he could have listed every name in his grievance. The Court recognizes that Butler prepared his grievance under less-than-desirable circumstances. (ECF No. 24, PageID.246.) However, the grievance process was still "capable of use," even if the medical records were not. *Ross*, 578 U.S. at 642–43.

Butler also contends that prison administrators thwarted his attempts to take advantage of the grievance process because they refused to assist him. (ECF No. 24, PageID.246.) Butler's argument rests on whether assistance was due to him under ¶¶ F and M of MDOC Policy Directive 03.02.130 (effective July 9, 2007). (*Id*. at PageID.246–47.) This Court finds that assistance was not due to him.

Under limited circumstances, MDOC policy requires assistance for prisoners and parolees who need help to complete a grievance form. MDOC Policy Directive 03.02.130 ¶ M (effective July 9, 2007). This directive provides assistance to someone who may have issues that affect their ability to write a grievance, such as cognitive disability or illiteracy. *See Doe v. Michigan Department of Corrections*, No. 13-14356, 2016 WL 465496 at *10 (E.D. Mich. Feb. 8, 2016); *see also Peterson v. Hall*, No. 11-CV-15154, 2012 WL 3111632 (E.D. Mich. July 2, 2012), report and recommendation adopted No. 11-14154, 2012 WL 3111629 (E.D. Mich. July 31, 2012) (suggesting that ¶ M addresses what to do if a grievant is illiterate or mentally impaired). Butler does not allege any cognitive disability or lack of literacy at the time he filed his grievance. Thus, he was not entitled to assistance under MDOC Policy Directive 03.02.130 ¶ M (effective July 9, 2007).

MDOC Grievance policy indicates that grievances that raise non-grievable issues shall be rejected. MDOC Policy Directive 03.02.130 ¶ F (effective July 9, 2007). The list of non-grievable issues includes "[i]ssues not within the authority of the Department to resolve." *Id*. If a grievant raises such an issue, "[t]he grievant shall be told who to contact in order to attempt to resolve the issue, if known." *Id.* There is no indication that Butler raised a non-grievable issue. Therefore, Butler was also not entitled to assistance under MDOC Policy Directive 03.02.130 ¶ F (effective July 9, 2007).

Butler did not name Papendick. Thus, Butler did not comply with MDOC policy. MDOC Policy Directive 03.02.130 (effective July 9, 2007) ¶ R; MDOC Policy Directive 03.02.130 (effective Mar. 18, 2019) ¶ S. Butler's grievances cannot satisfy the PLRA's exhaustion requirement. *Woodford*, 548 U.S. at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules.") Butler cannot maintain his claims against Papendick.

## IV. Conclusion

For the foregoing reasons, the undersigned **RECOMMENDS** that Papendick's motion for summary judgment (ECF No. 23) be **GRANTED**.

Dated: August 8, 2022

s/**Jonathan J.C. Grey**
Jonathan J.C. Grey
United States Magistrate Judge

**Notice to the Parties About Objections**

Within 14 days of being served with a copy of this Report and Recommendation, any party may object to and seek review of the proposed findings and recommendations set forth above. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). If a party fails to timely file specific objections, any further right of appeal is waived. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Only specific objections to this Report and Recommendation are preserved for appeal; all other objections are waived. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). Each objection must be labeled as "Objection No. 1," "Objection No. 2," etc. Each objection must specify precisely the provision of this Report and Recommendation to which it pertains. In accordance with Local Rule 72.1(d), copies of objections must be served on this Magistrate Judge.

A party may respond to another party's objections within 14 days after service of any objections. Fed. R. Civ. P. 72(b)(2). Any such response should be concise and address each issue raised in the objections in the same order and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

**Certificate of Service**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 8, 2022.

<u>s/ **S. Osorio**</u>
Sandra Osorio
Case Manager